**AIRTRAN AIRLINES, INC., Plaintiff,**

v.

**PLAIN DEALER PUBLISHING CO., doing business as the Plain Dealer, Defendant.**

**No. 1:98–CV–1750–CAM.**

United States District Court, N.D. Georgia, Atlanta Division.

Feb. 26, 2002.

L. Linn Wood, Jr., Kimberly W. Rabren, Office of L. Lin Wood, Atlanta, GA, for Plaintiff.

Peter Crane Canfield, Sean R. Smith, Cynthia L. Counts, Dow Lohnes & Albertson, Atlanta, GA, for Defendant.

C. B. Rogers, Atlanta, GA, Pro se.

## ORDER

MOYE, District Judge.

The above-styled action is before the Court on defendant's second motion for summary judgment with respect to plaintiff's claim that defendant libeled it by publishing the following news article on January 11, 1998:

*New name, old problems for ValuJet*

FAA finds faults at AirTran Safety violations continue to plague airline, documents show

FAA finds faulty repairs, other problems at AirTran

When FAA inspectors recently visited a contractor repainting several former ValuJet Airlines planes with the company's new red, teal and white paint scheme, they discovered that rudders used to steer the planes in flight had been improperly reinstalled.

Those inspectors found other serious safety violations concerning the airline, now called AirTran Airlines, including falsified documents, improper maintenance, faulty repairs and repeated failures to supervise contractors, according to internal Federal Aviation Administration documents obtained by The Plain Dealer.

The documents, based on a three-week inspection that ended Nov. 7, show the airline had a larger number of serious safety-related violations than a February 1996 report that recommended the airline be grounded. That warning went unheeded until after the May 11, 1996,

crash of ValuJet Flight 592 in the Everglades claimed 110 lives.

After the crash, the FAA said the airline had lost control of its maintenance and the airline voluntarily grounded itself for four months until Sept. 30, 1996.

Last September, ValuJet changed its name and its paint scheme. It now serves 45 locations, including Akron–Canton Regional Airport.

Lori LeRoy, an AirTran spokeswoman, declined to discuss specific safety problems mentioned in the FAA documents, but said, "Informally, we understand that the outcome was excellent." She declined further comment.

The FAA documents include a preliminary draft of the agency's AirTran inspection report. The draft report mentions numerous safety problems that have been documented in at least four previous FAA inspections and one conducted by the Defense Department. The draft report alleges:

Three instances of failing to properly calculate the proper weight and balance of aircraft to determine safe takeoff and landing speeds.

A senior pilot who oversees the qualifications of other pilots falsified information about the experience of an unspecified number of them.

Failure to examine seven planes' transponders, which send out altitude and directional information to traffic controllers, after the planes received major overhauls.

Improperly trained workers renovated an unspecified number of cabins to make way for larger business-class seats and modify the passengers' emergency oxygen system.

Failure to have an FAA-required program to properly inspect fuel tanks for corrosion.

Margaret Gilligan, the FAA's deputy associate administrator for regulation and certification, said she could not comment until the final report is completed and its findings are validated.

"I think we do want to make it clear we are very mindful of the continuing interest by the public in aviation safety generally and in our continued oversight of AirTran," she said. "We are considering that as we continue to refine this inspection."

Refining the AirTran inspection apparently has provoked an internal dispute between the FAA team that performed the inspection and the Atlanta FAA office that oversees AirTran, sources familiar with the inspection say. Such inspections are widely accepted in the aviation industry as not only an evaluation of the airline, but also of the FAA office that routinely oversees it.

Another indication of an apparent internal dispute is the length of time it has taken for the AirTran report to be completed. Such reports usually are finalized within about 30 days and available to the public under the Freedom of Information Act.

Gilligan, however, downplayed the issue, describing it as a disagreement over the findings, and defended the agency's oversight. She said a second team was sent to reinspect the airline in late November and early December. She said both teams had been ordered to prepare the final report.

The FAA's AirTran inspections come 18 months after the agency promised Congress, families of those killed in the ValuJet crash and the flying public that it would change the way it oversees ValuJet and other emerging airlines. It vowed to better inspect airlines, better train its inspectors and better use its resources.

The agency's promises won support and praise in Congress, which added $758

million to the FAA's $8 billion budget to make improvements, including hiring 367 additional safety inspectors.

Concern about the FAA's recent inspection of AirTran has attracted the attention of Democratic Rep. Peter A. DeFazio of Oregon, who said Friday that he had asked FAA Administrator Jane Garvey for a full accounting of the airline's safety problems.

"They [FAA] are acting more to protect the industry or, in this case, one particular carrier than they are to fully inform the public of concerns that they have that the flying public would share," said DeFazio, a member of the House Transportation subcommittee on aviation, which conducted hearings in 1996 into the fatal crash.

And Republican Sens. John McCain of Arizona, chairman of the Commerce, Science and Transportation Committee, and Slade Gorton of Washington, chairman of the committee's aviation subcommittee, are scheduled to be briefed by the FAA tomorrow concerning the AirTran inspection, according to a Senate official.[1]

On June 22, 1998, plaintiff filed its complaint for libel. In its complaint, plaintiff alleged that the Article contained numerous false and defamatory statements which damaged plaintiff's business and business reputation by conveying to the public that plaintiff operated an unsafe airline. Plaintiff further alleged that the false and defamatory statements about plaintiff were negligently published by defendant and were published with actual malice.

### LEGAL DISCUSSION

Rule 56 of the Federal Rules of Civil Procedure establishes the standard for ruling on summary judgment motions: Courts should grant summary judgment when "there is no genuine issue as to any

material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56 ©. The party seeking summary judgment bears "the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of [the record] 'together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 159–60, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437–38 (11th Cir.1991).

In meeting this initial responsibility, for issues on which the movant would bear the burden of proof at trial, "that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Four Parcels of Real Property*, 941 F.2d at 1438 (citations and internal quotation marks omitted). For issues on which the non-movant would bear the burden of proof at trial,

> the moving party is not required to support its motion with affidavits or other similar material *negating* the opponent's claim . . . . [T]he moving party simply may show[ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the non-moving party's case. Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial.

*Four Parcels of Real Property*, 941 F.2d at 1438 (citations, footnote and internal quotation marks omitted).

---

1. A photocopy of the article is attached to this    order.

In determining whether the movant has met its burden, the court views the evidence in the light most favorable to the party opposing the motion. *Adickes,* 398 U.S. at 158–59, 90 S.Ct. 1598. Moreover, "[r]easonable doubts as to the facts should be resolved in favor of the nonmoving party," *Borg–Warner Acceptance Corp. v. Davis,* 804 F.2d 1580, 1582 (11th Cir.1986), "... and all justifiable inferences are to be drawn in his favor." *Everett v. Napper,* 833 F.2d 1507, 1510 (11th Cir.1987). The movant's failure to meet this initial burden ends the inquiry and summary judgment should be denied.

However, once the initial burden has been met the "burden shift[s] to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark,* 929 F.2d 604, 608 (11th Cir.1991). At this point, "the non-moving party [must] go beyond the pleadings and by affidavits of [his or her] own, or by the 'depositions[,] answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Russ v. International Paper Co.,* 943 F.2d 589, 592 (5th Cir.1991) (quoting *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548). *Accord, Four Parcels of Real Property,* 941 F.2d at 1437–38. Denials or allegations by the non-movant in the form of legal conclusions which are unsupported by any specific facts have no probative value, and thus, are insufficient to create issues of material fact that would preclude summary judgment. *Broadway v. City of Montgomery,* 530 F.2d 657, 660 (5th Cir. 1976).[2] Whether facts are material is determined by the applicable substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

To avoid summary judgment on issues on which the movant would bear the burden of proof at trial, the non-movant "must come forward with evidence sufficient to call into question the inference created by the movant's evidence on the particular material fact." *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1116 (11th Cir.1993). For issues on which the non-movant would bear the burden of proof at trial and where the movant puts on evidence affirmatively negating the material fact, "the non-movant must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." *Id.* at 1116. Finally, for issues on which the non-movant would bear the burden of proof at trial and where the movant demonstrates an absence of evidence on the issue, the non-movant must respond either by "show[ing] that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, ... [or by] com[ing] forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116–17.

■ As defendant points out on page 2 of its Reply Brief in Support of its Motion for Summary Judgment, under current First Amendment newspaper libel law, plaintiff being an acknowledged "public figure," must show "[i]n order to support its defamation claim .... among other things, that each statement about which it complains is (1) substantially false and (2) in fact published with actual malice, i.e.,with actual knowledge of its falsity or with serious subjective doubts in fact as to its truth." Also, "[a]ctual malice must be shown by clear and convincing evidence."

---

2. In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), the Court of Appeals for the Eleventh Circuit adopted as precedent all decisions of the former Fifth Circuit decided prior to October 1, 1981.

There is no dispute as to what is required to be proved by plaintiff or as to the standard of proof required.[3] The defendant's position on summary judgment is that plaintiff will be unable at trial to prove the essential elements of its case with the required clear and convincing evidence.

Since the plaintiff would have the burden at trial of proving by clear and convincing evidence that defendant's publication in fact was false, and published with actual malice, it is plaintiff's burden on this summary judgment motion to "respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact[s] sought to be negated" by showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict." Here, as on a directed verdict motion at trial, the Court views the evidence in the light most favorable to plaintiff, resolves every reasonable doubt in plaintiff's favor, and draws all justifiable inferences in plaintiff's favor.

As required by the specific holding in *Anderson*, the Court at this summary judgment stage has viewed plaintiff's proffer of evidence in support of the complaint in light of the heightened evidentiary requirements where public figures are concerned, that is, whether the evidence proffered by plaintiff is such that a reasonable jury might find that actual malice had been shown with convincing clarity— *Anderson, supra,* 257, 106 S.Ct. 2505.

In support of its rebuttal to defendant's motion, plaintiff has proffered the Court a voluminous Appendix to its Response to Defendant's Second Motion for Summary Judgment containing portions of the record it believes to be relevant and pertinent to the issues before the Court, and which the Court has considered in light of the summary judgment principles enunciated above. Of specific relevance to the issue of actual malice there is in the appendix the deposition of the investigative reporter demonstrating her extensive technical knowledge of the organization and workings of the FAA with particular reference to its safety inspection functions and the regulations and protocols relating thereto. Also included in plaintiff's Appendix are the actual safety programs here involved, including, importantly the final report which became the official FAA document, and defendant's newspaper article reporting what were the actual FAA official findings, as well as transcripts of the reporter's conversations with persons at the FAA and at plaintiff airline setting forth her knowledge (and thus of defendant) of the matter at hand.

■■■ The Court now finds that there is a genuine issue of material fact as to whether the front page bold headline commencing "FAA Finds..." and the inner page headline commencing "FAA Finds.." are false and that the evidence indicates plaintiff could so prove by clear and convincing evidence. The Court also finds that there is a genuine issue of material fact as to whether there had been a previous recommendation to the FAA that plaintiff be grounded, the disregard of which by the FAA was a proximate cause of plaintiff's 1996 tragic Everglades crash in which numerous lives were lost, and the record before the Court indicates that plaintiff may be able to so prove by clear and convincing evidence. Plaintiff claims

---

**3.** The fair reporting privilege incorporated into media libel law would seem to admit the publication and falsity of the alleged libelous matter, but assert it to be insufficiently egregious in light of practical reporting requirements to be actionable—also, it looks like an affirmative defense. But the Court will treat it as being essentially the element that requires plaintiff's proof of falsity and malice to be "clear and convincing"—a heightened standard as compared to preponderance of the evidence.

other instances of falsity in the Article which the Court finds no reason to consider here in view of its findings above.

With respect to the claims of falsity as to the headlines mentioned above, the defendant makes two arguments, as the Court understands them: (1) that even if false, the falsity is within the protective ambit of the "fair reporting privilege" as laid out by the Courts, notably the Supreme Court in reconciling the law of libel as related to the news media and the First Amendment rights of Freedom of Speech and Freedom of the Press; and (2) the principle of law that the claimed libelous matter must be considered as a whole, not merely in isolated context, and that with respect to newspaper libel, the standard for doing so is the "average" or "ordinary" reader. The Court has done so here.

As to the fair reporting privilege, mainly protecting matter written under the pressure of imminent publication by persons who might not be familiar with the subject matter, the record here shows that the article was in fact investigative, not news, reporting; that it was based on a "leaked" document which lay on the investigative reporter's desk for at least a couple of weeks before it received any attention, and that it was only about three-to-four weeks later, just two days before publication, that the reporter really began working on it by calling persons at the FAA and AirTran, asking for information and access to persons to which she undoubtedly would be denied. The record indicates that contacting the FAA itself was purely routine because "we have a rule that whenever we think we are going to be using some information we try to run it by the agency involved. If you don't want to respond. That's O.K." CPD–000772.

It is difficult to define who would be the average reader of an article such as this. Some people might read it carefully all the way through. Some might merely glance at the headline, recall the past which the article was deliberately invoking, and say "that's all I need to know, I'm not going to fly that airline again". And there is a wide middle ground. Perhaps most telling here is that the headline writer himself testified he thought the headlines accurately reflected the substance of the article. The authorities are not uniform as to what constitutes the average reader of any newspaper article. It seems to the Court that it is a case by case factual inquiry, and it is the Court's finding that plaintiff may be able to prove by clear and convincing evidence that in this case the average reader might well have read the emphasized matter, contended to be false, and not the fine print—in somewhat like fashion to the person who fails to read the exculpatory fine print in a contract.

In sum, the Court finds that giving plaintiff the benefit of all legitimate inferences, and deciding contested issues of fact in plaintiff's favor, the plaintiff has sufficiently carried its burden, under prevailing First Amendment law, to rebut defendant's summary judgment motion by clear and convincing evidence.

Although defendant originally raised a question as to plaintiff's ability to prove damages resulting from the libel, the Court understands that defense to have been abandoned.

The joint proposed pretrial shall be due 45 days from the date of this order.

### CONCLUSION

The court hereby DENIES defendant's motion for summary judgment.

SUNDAY

# THE PLAIN DEALER

OHIO'S LARGEST NEWSPAPER   $1.50   SUNDAY

CLEVELAND, JANUARY 11, 1998

## New name, old problems for ValuJet
# FAA finds faults at AirTran

A ground crew worker directs an AirTran Airlines DC-9 at Akron-Canton Regional Airport. The airline, formerly known as ValuJet, is alleged to have serious safety violations, according to a preliminary report by the Federal Aviation Administration.

### Safety violations continue to plague airline, documents show

by ELIZABETH MARCHAK
PLAIN DEALER REPORTER

WASHINGTON — When FAA inspectors recently visited a contractor repairing several former ValuJet Airlines planes with the company's new red, teal and white paint scheme, they discovered that rudders used to steer the planes in flight had been improperly reinstalled.

Those inspectors found other serious safety violations concerning the airline, now called Air Tran Airlines, including falsified documents, improper maintenance, faulty repairs and repeated failures to supervise contractors, according to internal Federal Aviation Administration documents obtained by The Plain Dealer.

The documents, based on a three-week inspection that ended Nov. 7, show the airline had a larger number of serious safety-related violations than a February 1996 report that recommended the airline be grounded.

That warning went unheeded until after the May 11, 1996, crash of ValuJet Flight 592 in the Everglades claimed 110 lives.

After the crash, the FAA said the airline had lost control of its maintenance and the airline voluntarily grounded itself for four months until Sept. 30, 1996.

Last September, ValuJet changed its name and its paint scheme. It now serves 45 locations, including Akron-Canton Regional Airport.

Last night, an AirTran spokeswoman declined to discuss specific safety problems mentioned in the FAA documents, but said, "Informally, we understand that the outcome was excellent." She declined further comment.

The FAA documents include a preliminary draft of the agency's AirTran inspection report. The draft report mentions numerous safety problems that have been documented in at least four previous FAA inspections and one conducted by the Defense Department. The draft report alleges:

✔ Three instances of failing to properly calculate the proper weight and balance of aircraft to determine safe takeoff and landing speeds

SEE AIRTRAN/23-A

1274

# FAA finds faulty repairs, other problems at AirTran

AIRTRAN FROM 1 A

✔ A senior pilot who oversees the qualifications of other pilots falsified information about the experience of an unspecified number of them.

✔ Failure to examine seven planes' transponders, which send out altitude and directional information to traffic controllers, after the planes received major overhauls.

✔ Improperly trained workers renovated an unspecified number of cabins to make way for larger business-class seats and modify the passengers' emergency oxygen system.

✔ Failure to have an FAA-required program to properly inspect fuel tanks for corrosion.

Margaret Gilligan, the FAA's deputy associate administrator for regulation and certification, said she could not comment until the final report is completed and its findings are validated.

"I think we do want to make it clear we are very mindful of the continuing interest by the public in aviation safety generally and in our continued oversight of Air-Tran," she said. "We are considering that as we continue to refine this inspection."

Refining the AirTran inspec-tion apparently has provoked an internal dispute between the FAA team that performed the inspection and the Atlanta FAA office that oversees AirTran, sources familiar with the inspection say. Such inspections are widely accepted in the aviation industry as not only an evaluation of the airline, but also of the FAA office that routinely oversees it.

Another indication of an apparent internal dispute is the length of time it has taken for the Air-Tran report to be completed. Such reports usually are finalized within about 30 days and available to the public under the Freedom of Information Act.

Gilligan, however, downplayed the issue, describing it as a disagreement over the findings, and defended the agency's oversight. She said a second team was sent to reinspect the airline in late November and early December. She said both teams had been ordered to prepare the final report.

The FAA's AirTran inspections come 18 months after the agency promised Congress, families of those killed in the ValuJet crash and the flying public that it would change the way it oversees Valu-Jet and other emerging airlines. It vowed to better inspect airlines, better train its inspectors and better use its resources.

The agency's promises won support and praise in Congress, which added $758 million to the FAA's $8 billion budget to make improvements, including hiring 367 additional safety inspectors.

Concern about the FAA's recent inspection of AirTran has attracted the attention of Democratic Rep. Peter A. DeFazio of Oregon, who said Friday that he had asked FAA Administrator Jane Garvey for a full accounting of the airline's safety problems.

"They [FAA] are acting more to protect the industry or, in this case, one particular carrier than they are to fully inform the public of concerns that they have that the flying public would share," said DeFazio, a member of the House Transportation subcommittee on aviation, which conducted hearings in 1996 into the fatal crash.

And Republican Sens. John McCain of Arizona, chairman of the Commerce, Science and Transportation Committee, and Slade Gorton of Washington, chairman of the committee's aviation subcommittee, are scheduled to be briefed by the FAA tomorrow concerning the AirTran inspection, according to a Senate official.

*Marchak can be reached by sending email to: marchak@digex.com*